IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CHARLES J. BOERNGEN, | ) | Case No. _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **COMPLAINT AND JURY DEMAND** |
| NEBRASKA PUBLIC POWER DISTRICT, a political subdivision, | ) | |
| | ) | |
| Defendant. | ) | |

COMES NOW the Plaintiff, by and through his attorneys, and for his causes of action against the Defendant hereby states the following:

**PARTIES-VENUE-JURISDICTION**

1. Plaintiff CHARLES J. BOERNGEN (hereafter "Plaintiff" or "Boerngen"), is a resident of Norfolk, Madison County, Nebraska.

2. Defendant NEBRASKA PUBLIC POWER DISTRICT (hereafter "Defendant" or "NPPD") is a public corporation and a political subdivision with its principal office located in Columbus, Platte County, Nebraska.

3. This Court has original jurisdiction over the claims arising under Federal law and concurrent jurisdiction over the state law claims. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. Section 1331 and the Court's pendent claim jurisdiction under 28 U.S.C. §1367(a).

4. Venue is proper in this district under 28 U.S.C. §§1391(b) and (c).

5. On or about January 26, 2022, Plaintiff received the Nebraska Equal Opportunity Commission's "reasonable cause" determination with respect to Plaintiff's charge, NEB-1-18/19-10-50001-RS.

6. On or about April 15, 2022, less than 90 days prior to the filing of this Complaint, the Nebraska Equal Opportunity Commission issued an administrative dismissal with respect to Plaintiff's charge, NEB 2-20/21-7-51475-RS.

7. On or about June 2, 2022, less than 90 days prior to the filing of this Complaint, the U.S. Equal Employment Opportunity Commission issued Plaintiff a Notice of Right to Sue on charge 32E-2020-00564.

1

**FACTUAL BACKGROUND**

8.  Boerngen commenced employment with Defendant in October 2006 until he was wrongfully terminated on May 28, 2020. Boerngen most recently worked as a Journey Substation Tech for Defendant NPPD.

9.  During his employment with Defendant, Boerngen suffered from a cardiac condition, resulting in the placement of a pacemaker on December 26, 2019. Boerngen's physical impairments substantially limited his major life activities of seeing, sleeping, standing, walking, working and his major bodily functions of his cardiovascular, respiratory and circulatory systems.

10. On or about December 10, 2019, Boerngen had a medical appointment and was told he needed a pacemaker to treat a Type 2 Second Degree Mobitz AV Block.

11. At the December 10, 2019 appointment, Boerngen discussed his job duties with his physician and was told that there would be no work restrictions following placement of a pacemaker. Boerngen requested the manufacturer specifications for the pacemaker to be installed, as requested by NPPD.

12. Shortly after the December 10, 2019 appointment, and prior to even scheduling surgery, Boerngen contacted Medtronic and was given the device specification documents. Boerngen was further assured by the Medtronic representative that there should be no issue with returning to work.

13. The Medtronic specifications requested by NPPD were received by NPPD no later than December 30, 2019.

14. On January 20, 2020, Boerngen returned to work following his surgery with a medical note stating that he could return to work without restrictions. Boerngen was advised by Human Resources representative Brenda Bieck that he would not be allowed to enter an energized substation until NPPD completed a study and compared their findings with the Medtronic specifications.

15. On February 4, 2020, Boerngen had a meeting with District Manager Dale Schoening, his direct supervisor Keith Leader, and Human Resources representatives Bieck and Justine Dvorak.

16. At the February 4, 2020 meeting, Boerngen was told that they had tested the Hoskins Substation, one of Boerngen's fifty-three (53) assigned locations and that he was unable to work there due to the voltages. Boerngen was told that he could apply for any vacant positions

or apply for long term disability due to his disability.

17. NPPD agreed to provide temporary transitional work for Boerngen until March 27, 2020.

18. During February 2020, Boerngen received a lump sum raise instead of an hourly raise. The amount and nature of the raise were less and different than what he had been promised prior to placement of the pacemaker.

19. Boerngen had another meeting on February 14, 2020 with his wife, Dawn Boerngen, and Bieck and Kathy Michaelson. NPPD wished to further discuss Boerngen applying for LTD benefits. They advised Boerngen that a medical doctor they had retained, Dean Wampler, M.D., was reviewing the device specifications and their testing results from the Hoskins Substation to determine Boerngen's safety while performing his job. Boerngen was further advised that his work release would be an issue if he applied for LTD benefits, and he was encouraged to have his doctor change his work release.

20. Boerngen called his physician on February 14, 2020 to ask that the work release be changed, in the presence of Leader. Dr. Ackerman's office told Boerngen that he was capable of doing his job and asked if he was sure he wanted the note changed. Dr. Ackerman's office advised Boerngen to go onsite, while they watched remotely, to see if there was a medical issue that would keep him from working at his assigned sites. Leader heard the suggestion and told Boerngen that it would not be allowed.

21. On February 17, 2020, Dr. Wampler wrote to NPPD to state that Boerngen should be medically disqualified from working at certain worksites, such as Hoskins. Boerngen was provided a copy of this letter on February 19, 2020.

22. Boerngen applied for LTD benefits on March 19, 2020 due to the pressure that NPPD was placing on him to do so.

23. At the end of March 2020, Boerngen's temporary transitional work period was extended to April 30, 2020.

24. On March 30, 2020, Boerngen submitted a written request for an accommodation of not working at the single site identified as an issue by NPPD, the Hoskins Substation.

25. On March 31, 2020, Boerngen submitted additional information on his accommodation request clarifying that his doctor's office would be alerted if there was any pacemaker issue, they would notify Boerngen the day of the alert and Boerngen would be happy

to notify NPPD immediately. Boerngen reiterated that both his specialist, Dr. Ackerman, and the device manufacturer insisted he was able to continue working his job.

26. On April 2, 2020, Boerngen submitted an updated request for an accommodation, after receiving feedback from Leader. In that request, Boerngen pointed out that the 230Kv and above limitation they were imposing would only prohibit him from being in 10 out of approximately 53 transmission substations, and that there were 13 other employees with his identical job description that could work in the prohibited areas of the Hoskins Substation.

27. NPPD denied Boerngen's requests for accommodation on April 30, 2020, continued Boerngen's transitional work until May 29, 2020, and again asserted that he could apply for LTD or apply for an open position with NPPD.

28. Boerngen's LTD disability claim was denied on May 5, 2020, because Boerngen had been released to return to work with no restrictions by Dr. Ackerman.

29. NPPD did not offer to place Boerngen in open positions that he was qualified for. As a result, Boerngen applied for several open positions that were posted with NPPD, but he was rejected for all of the positions:

   a. On November 25, 2019, Boerngen applied for a corporation safety manager position and was never interviewed.
   b. On January 28, 2020, Boerngen applied for a HVAC/Electrical Building Maintenance position and was never interviewed.
   c. On January 28, 2020, Boerngen applied for a transmission control operator position, and was rejected in early March 2020. No one was selected for the position.
   d. On February 10, 2020, Boerngen applied for a part time dispatch position and was never interviewed.
   e. On February 11, 2020, Boerngen applied for a Safety Compliance Lead position and was never interviewed.
   f. On February 20, 2020, Boerngen applied for a Manager Retail Technician position and was never interviewed.
   g. On March 16, 2020, Boerngen applied for a reliability comp lead position and was never interviewed.
   h. On March 23, 2020, Boerngen applied for an Asset Management position. In May

4

2020, Boerngen became aware that a coworker, Chad Krackimeier was selected for the position. Boerngen was equally qualified for the position as Krackimeier.

    i. On March 31, 2020, Boerngen applied for a Planner Scheduler position. Boerngen was rejected without comment.

    j. On April 20, 2020, Boerngen applied for a HVAC/Electrical Building Maintenance position and was never interviewed.

30. Boerngen was either qualified for each of the positions he applied for with NPPD or he was told to apply for everything that was open.

31. Boerngen's employment was terminated by NPPD on May 28, 2020.

32. Prior to termination, Boerngen's job performance was satisfactory.

33. At the time of his termination, Boerngen was earning $46.25 per hour working approximately 40 hours per week. As of the date of this filing, Boerngen's lost wages resulting from Defendant's wrongful conduct are in excess of $62,000.00, not including the employment benefits he received.

34. As a result of Defendant's wrongful conduct, Boerngen suffered lost wages, compensatory damages, including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and has also incurred attorney's fees and other costs that are continuing.

COUNT I

DISABILITY DISCRIMINATION

Neb. Rev. Stat. §48-1104 ("NEFEPA")

35. Plaintiff hereby incorporates paragraphs 1 through 34 as if fully set forth herein and states:

36. Defendant is and was at all times material an "employer" within the meaning of under Neb. Rev. Stat. §48-1102.

37. Plaintiff is and was disabled within the meaning of the NEFEPA.

38. Defendant regarded Plaintiff as disabled by an actual or perceived impairment that substantially limits a major life activity.

39. Plaintiff was qualified to perform the essential functions of the job, with or without accommodation.

40. At all times relevant, Plaintiff suffered from an impairment that substantially limited one or more of his major life activities or major bodily functions.

41. Defendant discriminated against Plaintiff because of his disability and altered a term, condition and/or privilege of his employment, including but not limited to termination of his employment and failing to re-hire him in another position.

42. Defendant failed to accommodate Plaintiff's disability by refusing to place him in an open position that he was qualified for in violation of the NEFEPA.

43. Defendant failed to engage in good faith in an interactive process with Plaintiff to assist him in accommodating his disability in violation of the NEFEPA.

44. Plaintiff's disability was a motivating factor in such discrimination, failure to accommodate and failure to engage in the interactive process.

45. As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer injuries and damages, including, but not limited to mental and emotional distress; humiliation; fear, embarrassment; lost enjoyment of life; lost wages and benefits; front pay and other emoluments of employment.

## COUNT II
## DISABILITY DISCRIMINATION
## 42 U.S.C. §§12101 et seq. ("ADA")

46. Plaintiff hereby incorporates paragraphs 1 through 45 as if fully set forth herein and states:

47. Defendant is and was at all times material an "employer" within the meaning of under 42 U.S.C. §12111.

48. Plaintiff is and was disabled within the meaning of the ADA, as amended.

49. Defendant regarded Plaintiff as disabled by an actual or perceived impairment that substantially limits a major life activity.

50. At all times relevant, Plaintiff suffered from an impairment that substantially limited one or more of his major life activities or major bodily functions.

51. At all times relevant, Plaintiff was able to perform the essential functions of his job, with or without reasonable accommodation.

52. Defendant discriminated against Plaintiff because of his disability and altered a term, condition and/or privilege of his employment, including but not limited to termination of his employment and failing to re-hire him in another position.

53. Defendant failed to accommodate Plaintiff's disability by refusing to place him in an open position that he was qualified for in violation of the ADA.

54. Defendant failed to engage in good faith in an interactive process with Plaintiff to assist his in accommodating his disability in violation of the ADA.

55. Plaintiff's disability was a motivating factor in such discrimination, failure to accommodate and failure to engage in the interactive process.

56. The unlawful employment practices complained of above were malicious or recklessly indifferent to Plaintiff's rights as protected by Federal law, and by its conduct Defendant are subject to punitive damages.

57. As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer injuries and damages, including, but not limited to mental and emotional distress; humiliation; fear, embarrassment; lost enjoyment of life; lost wages and benefits; front pay and other emoluments of employment.

## COUNTS III AND IV
## RETALIATION
## 42 U.S.C. §12203 and Neb. Rev. Stat. §48-1114

58. Plaintiff hereby incorporates paragraphs 1 through 57 as if fully set forth herein and states:

59. During his employment, Plaintiff engaged in protected activity, including but not limited to exercising his rights under the ADA and NEFEPA, by requesting a disability accommodation and making a disability discrimination complaint.

60. Defendant took adverse employment action against Plaintiff, including but not limited to terminating his employment and failing to re-hire him in another position.

61. There is a causal connection between Plaintiff's participation in protected activity and Defendant's adverse action against him.

62. The unlawful employment practices complained of above were malicious or recklessly indifferent to Plaintiff's rights as protected by Federal law, and by its conduct Defendant are subject to punitive damages.

63. As a result of Defendant's retaliation, Plaintiff has in the past and will in the future suffer injuries and damages, including, but not limited to mental and emotional distress;

humiliation; fear, embarrassment; lost enjoyment of life; lost wages and benefits; front pay and other emoluments of employment.

## DAMAGES

64. Plaintiff hereby incorporates by reference paragraphs 1 through 63 and states:

65. As a result of Defendant's discrimination, retaliation, and wrongful termination, Plaintiff has suffered damages and seeks the following relief:

   a. Lost wages and benefits to the time of trial;
   b. Front pay;
   c. Compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;
   d. Punitive damages under Federal law;
   e. Attorney's fees, expert witness fees and other reasonable costs; and,
   f. Pre-judgment and post judgment interest.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate him for his injuries and damages, for all his general, special, and punitive damages, for costs, attorney's fees, interest and for such other relief as just and equitable.

Plaintiff demands a trial by jury.

Dated: July 13, 2022.

CHARLES J. BOERNGEN, Plaintiff

BY: s/ Jennifer Turco Meyer
Jennifer Turco Meyer, #23760
Of Dyer Law, P.C., LLO
2611 S. 117th Street
Omaha, Nebraska 68144
(402) 393-7529
(402) 391-2289 facsimile
Jennifer@dyerlaw.com
Attorney for Plaintiff
